UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| KAREN ELIAS CLAVET, Plaintiff, v. LINCOLN SCHOOL COMMITTEE; and in their official and individual capacities, SCOTT BARR, Chairperson, ERIN CASEY, and GERARD ST. GERMAINE; in their official capacities SUSAN McCLAIN and JEFFREY WEISS; and in his official capacity, STEVE WOERNER, FINANCE DIRECTOR, TOWN OF LINCOLN, Defendants. | C.A. No. 04- 374 T |

**AFFIDAVIT OF KAREN ELIAS CLAVET IN SUPPORT MOTION FOR TEMPORARY RESTRAINING ORDER**

I, Karen Elias Clavet, being first duly sworn, depose and state as follows:

1. I am a resident of Lincoln, Rhode Island. My address is located at 84 Old River Road in Lincoln.

2. I believe that the Lincoln School Committee has failed to appoint me to a teaching position in the Lincoln public school system in retaliation for my political activism, and that my constitutional rights have been violated.

3. The following are current members of the Lincoln School Committee: Scott Barr, Chairperson, Erin Casey, Susan McClain, Gerard St. Germain, and Jeffrey Weiss.

4. As a resident of Lincoln, Rhode Island, I have had two children enrolled in the Lincoln public school system. At this time, I have one child enrolled in the Lincoln public school system.



SCANNED

3

5. As a parent and resident of the Town of Lincoln, I regularly attend school committee meetings to keep apprised of, and to voice my opinion on, school affairs.

6. To that end, I have been an active volunteer in the school system and have been an advocate for education for over ten years.

7. I am a member of the grassroots organization Operation Classrooms, and I was a co-chair of the Middle School Improvement Team.

8. I have spoken out at town and school committee meetings, sometimes critically, but always in a respectful manner, regarding practices that I felt were not in the best interest of the students.

9. Operation Classrooms was an organization formed in 2001 to generate support in the community for the construction of a middle school in the Town of Lincoln. In that capacity, I spoke at school committee meetings, urging the School Committee to endorse the construction of a new middle school. I repeatedly questioned the members of the School Committee in open session as to why it would not support the idea and received no response. I was active in lobbying for this group before the School Committee until a bond was passed last year in which voters approved the construction of a middle school.

10. For the school year 2002-2003, I served as the co-chair of the Middle School Improvement Team, wherein I was active in evaluating the state of the Lincoln Middle School. In this capacity, I assisted in putting together a strategic plan for student achievement at the middle school, which described the need for a new middle school.

11. Additionally, I have repeatedly spoken about the state of arts education in the Lincoln public school system during school committee meetings.

12. I am currently an art teacher in the Coventry public school system. I have been a teacher in the public school system for over six years.

13. In or about June, 2004, two art education positions in the Lincoln public school system were advertised. I applied for both positions.

14. One position was for a part-time teaching position at Lincoln High School, and the other position was for a full-time teaching position at the Lincoln Middle School.

15. On July 1, 2004, I interviewed with the screening committee for the part-time teaching position at the high school.

16. The screening committee was made up of David Enos (Chair of the Fine Arts Department), Rosemary Burns (teacher at the high school), Miranda Russell (teacher at the high school), Ray LeMay (interim principal at the high school), and Betsy Ritz (a parent).

17. The screening committee recommended me for a second interview with the interim superintendent, Arthur Campbell.

18. On July 13, 2004, I interviewed with interim superintendent, Arthur Campbell. We discussed the schedule for the part-time position, specifically whether the schedule would be over four days or five days of the school week. I told Mr. Campbell that regardless of the schedule, I remained interested in the job.

19. During my interview with Arthur Campbell, I also inquired as to the status of my application for the full-time teaching position at the middle school. Mr. Campbell assured me that my application would also be forwarded to the middle school for consideration for the full-time position there.

20. Later that afternoon, on July 13, 2004, I received a phone call from Arthur Campbell's secretary offering me the position of part-time art teacher at the high school. Following this phone call, some time later in the day, Mr. Campbell's secretary called me again to inform me that the schedule for the part-time position would be five days.

21. Arthur Campbell's recommendation of me for the position for the part-time art teacher at the high school was forwarded to the School Committee and placed on their agenda for the meeting on July 14, 2004.

22. On July 14, 2004, Arthur Campbell withdrew the recommendation, citing the uncertainty of the part-time schedule, although I had already been told by his office that the schedule was set. I was never notified of this action.

23. On July 15, 2004, I went to the school department to check on the status of my appointment, wherein I was informed of what happened. I then asked about my application for the full-time middle school position. I was told by the personnel director, Jill Teixera, that my file had been forwarded to the middle school for consideration and that I was on the list of interviewees.

24. The screening committee for the full-time middle school position was made up of David Enos (Chair of the Fine Arts Department), Bruce Macksoud (principal at the middle school), Miranda Russell (a teacher at the high school), and another teacher from the middle school.

25. On July 16, 2004, I was informed by Rosemary Burns that my application was not on file at the middle school.

26. At that point, I contacted a School Committee member and close friend, Susan McClain, to express my concern over my application.

27. Susan McClain contacted the personnel office and was told that my file was at the middle school and that I would be interviewed. I was never called for an interview.

28. On July 21, 2004, interviews were held for the full-time middle school teaching position.

29. Pursuant to school department policy, as a town resident, I am entitled to an interview.

30. I was told by Susan McClain that she had learned that School Committee Chairperson, Scott Barr, had ordered the superintendent's secretary not to release my file to anyone for any reason.

31. Susan McClain told me that she had contacted the Rhode Island Department of Education and spoke with David Abbott, the Acting Assistant Commissioner of Education, to whom she expressed her concerns regarding the hiring process.

32. Susan McClain also contacted Arthur Campbell to inquire about the status of my application. Mr. Campbell told her that he had every intention of appointing me to a position with the Lincoln public school system, but that he wanted to wait until I had had my middle school interview so that I could have my choice of positions. He also told her that he had checked my references, and that they were "stellar."

33. On August 3, 2004, the School Committee met, but the part-time high school appointment was not on the agenda although there were no scheduling issues over that position.

34. On August 6, 2004, I was finally granted an interview with the middle school search committee for the full-time art position.

35. On August 9, 2004, I received a phone call to schedule a second interview with Arthur Campbell.

36. On August 12, 2004, I interviewed with Arthur Campbell. During the meeting, he stated that he didn't feel that this meeting was necessary as we had already met, and he had already recommended me to the school committee; however, he wanted to explain recent events. He stated that he had been confused about the scheduling of the part-time position at the high school; and that, at that time, he had not yet finished checking my references. However, he said he had now checked my references and that I had gotten the highest praise that anyone could get: My current principal stated that he would want me to be his children's teacher.

37. During this interview, Mr. Campbell went on to ask me which of the two positions I preferred, and that the appointment would be made on August 14, 2004. I asked him if that meant that on Saturday I would have a job in Lincoln, and he said yes. He then added that I would have a job in Lincoln, pending School Committee approval. He added that in his years of experience, he had never seen it otherwise, i.e., where the school committee did not concur with the superintendent's recommendation. That afternoon, Mr. Campbell's secretary called to inform me that Mr. Campbell was putting my name forward for the full-time middle school art position.

38. On August 14, 2004, the School Committee met in open session, and I was present. An audiotape was made of this meeting. Present at this meeting were School Committee members, Scott Barr, Erin Casey, Susan McClain, and Gerard St. Germaine.

39. At this meeting, each appointment recommended by Arthur Campbell was taken up individually and approved. When Mr. Campbell put forth my name for appointment, the School Committee sat quietly and had no response. There was no motion to approve. No action was taken whatsoever.

40. The union president was present and expressed her frustration over the fact that the School Committee was ignoring the recommendation of the selection committee and the superintendent. There was no response from the School Committee.

41. Since she was a personal friend of mine, School Committee member Susan McClain had recused herself from the decision. However, following the School Committee's failure to act on my recommended appointment, Ms. McClain took a point of privilege to express her dismay at the events and stated that this was being done as a result of my political activity. There was no response from the School Committee members.

42. Following the meeting, my husband and I met with Arthur Campbell. Mr. Campbell stated that he had spoken to members of the School Committee prior to the meeting, and he knew that they would not appoint me. He would not reveal anything further about those conversations.

43. On Sunday, August 22, 2004, both teaching positions were re-advertised in the Providence Journal. I have again applied for both positions.

44. On August 25, 2004, the School Committee met in open session, and I was present. An audiotape was made of this meeting. During the portion of the meeting called, "Right To Be Heard," members of the screening committee(s) that had recommended me for the teaching positions addressed the School Committee. They raised concerns regarding the fact that no action has been taken on their recommendation and the subsequent recommendation of the superintendent.

45. During this portion of the meeting, one screening committee member pointedly asked why the School Committee had taken no action. The School Committee sat silent and did not respond. When she inquired as to whether she was going to get an answer to her

question, School Committee member Gerard St. Germaine stated that the policy provided that she had the right to be heard, but they were not permitted to respond.

46. At this point, School Committee member Susan McClain stated that Mr. St. Germaine's characterization of the policy was incorrect, and she was willing to respond. She stated that she believed the School Committee failure to act on my recommended appointment was in retaliation for my political activism. She also stated that the concerns over my political beliefs had been raised to her personally by other members of the School Committee.

47. Following this exchange, other members of the audience rose to speak to different issues (not related to my recommended appointment), after which members of the School Committee responded to their comments, despite their earlier protestations that they could not engage in such conduct.

48. At this meeting, when the School Committee reached the issue of appointments, Arthur Campbell's recommendations were taken up together instead of individually, as at the last meeting. The recommendations were quickly accepted and approved.

49. At this point in the meeting, Chairperson Scott Barr winked at me and stated, "Any of those new appointees here? No? I guess they thought they had it all sewn up," after which he laughed.

50. During all of the school committee meetings I have attended, the School Committee has always approved the superintendent's recommendation for appointment. I have never seen the School Committee take the kind of action with a recommended appointment as they did in my case.

51. I believe that the Lincoln School Committee has failed to appoint me to a teaching position in the Lincoln public school system in retaliation for my political activism, and that my constitutional rights have been violated.

Dated: August 27, 2004

I, Karen Elias Clavet, being first duly sworn, on oath depose and state that I have read the foregoing affidavit and that the factual allegations contained therein are true to the best of my knowledge and belief.

Karen Elias Clavet

Subscribed and sworn to before me, by Karen Elias Clavet, this 27th day of August, 2004.

Notary Public
My commission expires on: #6462
RI Bar No.